FILED
2019 Oct-01 AM 09:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **ROBERT A MORGAN,** | ] | |
| **Plaintiff,** | ] | |
| v. | ] | 2:17-cv-02031-ACA |
| **BIRMINGHAM BOARD OF EDUCATION, et al.,** | ] | |
| **Defendants.** | ] | |

## **MEMORANDUM OPINION**

Before the court is Defendant Birmingham Board of Education's ("the Board") motion for summary judgment. (Doc. 34).

Plaintiff Robert Morgan, a Caucasian man, filed this lawsuit against the Board, alleging that (1) the Board engaged in race and color discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Count One"); (2) the Board engaged in race and color discrimination, in violation of 42 U.S.C. § 1981 ("Count Two"); (3) the Board retaliated against him, in violation of Title VII, based on his complaints of discrimination ("Count Three"); and (4) the Board retaliated against him, in violation of § 1981, based on his complaints of discrimination ("Count Four"). (Doc. 1 at 7–16).

The court **WILL GRANT** the Board's motion for summary judgment and **WILL ENTER SUMMARY JUDGMENT** in favor of the Board and against

Mr. Morgan because he has not presented evidence from which a reasonable jury could find that the Board engaged in race or color discrimination, nor has he presented evidence that the Board declined to interview or hire him based on his engaging in a protected activity.

I.  **BACKGROUND**

On a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).

Robert Morgan began working for the Birmingham Board of Education in 1997. (Doc. 36-5 at 2 ¶ 3). By 2016 he was working as the Director of the Capital Improvement Projects ("CIP") Department. (*See* doc. 36-1 at 8, 84; doc. 36-3 at 37). The CIP Department employed four people: Mr. Morgan (the Director of the department), Cecil Eric Love (a project manager), Julian Woods (a project manager), and Lauren Gardner (a project manager). (Doc. 36-3 at 37). Mr. Love, Mr. Woods, and Ms. Gardner are all African-American. (*Id.*). In total, the salaries and benefits of all four department employees amounted to about $384,163.05 per year. (Doc. 36-6 at 3).

In this lawsuit, Mr. Morgan challenges as discriminatory and retaliatory three separate aspects of his employment with the Board: a demotion after the Board

eliminated the CIP Department; a failure to interview him for another Director position; and the decision to hire an African-American who Mr. Morgan asserts is less qualified than him for that Director position. (*See* Doc. 1 at 7–15).

1. The Demotion

In 2015 and 2016, the CIP Department was working on a renovation of Norwood Elementary School. (*See* Doc. 36-1 at 92). The general contractor, A.G. Gaston Construction Company ("A.G. Gaston"), was founded by a famous African-American (*see* doc. 46 at 11), and employed "minority subcontractors" (doc. 47-4 at 85). At some point, Mr. Morgan complained to his supervisors about the quality and timeliness of work done by A.G. Gaston and its subcontractors. (Doc. 36-1 at 20–22). In January 2016, A.G. Gaston's vice president asked to meet with Mr. Morgan at the work site and insisted that he and Mr. Morgan sit inside a car while leaving their cell phones on top of the car. (*Id.* at 17–18). He told Mr. Morgan that he had just left a meeting with A.G. Gaston's president and the superintendent and that although Mr. Morgan had "been good to work with, . . . there will be changes on this project." (*Id.*).

The next day, Mr. Morgan's supervisor issued him a letter of reprimand blaming him for the failure to complete the Norwood renovation on time. (Doc. 36-1 at 22, 90–91). Mr. Morgan responded with a letter of rebuttal, stating that he was not responsible for the failure to complete the project on time. (*Id.* at 92).

About a month later, the superintendent recommended eliminating the CIP Department, and the Board approved that recommendation. (Doc. 36-5 at 3 ¶ 4). Mr. Morgan contends that the elimination of the department was a pretext to retaliate against him for complaining about the minority-owned A.G. Gaston and its subcontractors. (Doc. 46 at 37–38). The superintendent, however, testified that she recommended eliminating the CIP Department as a way to save money for the school district because the Norwood renovation "was, if not the last, it was one of the last projects in the [capital projects] campaign. And we were trying to see how could we prevent having to go into the general fund to continue to pay for capital needs as those capital funds were running out." (Doc. 36-2 at 7, 11). She also testified that she could not remember Mr. Morgan criticizing the general contractor or any subcontractors working on the Norwood project. (Doc. 36-9 at 3–4).

The Board approved the superintendent's recommendation to eliminate the CIP Department. (Doc. 36-5 at 3 ¶ 4). The Board terminated the two probationary employees, Mr. Woods and Ms. Gardner (doc. 36-3 at 37; Doc. 36-5 at 4 ¶ 4; Doc. 36-6 at 4–5), but it offered to "transfer" the two most senior members of the Department, Mr. Morgan and Mr. Love, into the Facilities and Maintenance Department, which had openings for two project managers (doc. 36-5 at 3–4 ¶ 4). Mr. Love, who had been working as a project manager for the CIP Department,

accepted the transfer, retaining the same salary.[1]  (Doc. 36-5 at 3 ¶ 4).  Mr. Morgan, whose position would change from director to project manager, involving a reduction in his salary from $89,947 to $72,331 (doc. 36-1 at 84), contested the proposed demotion.  (Doc. 36-5 at 5 ¶ 5).

On November 9 and 21, 2016, the Board held an evidentiary hearing on Mr. Morgan's challenge to his demotion.  (Doc. 36-5 at 5 ¶ 5).  On November 9, Mr. Morgan testified that he believed the superintendent had recommended his demotion because he had complained about the work done by "minority subcontractors being used by A.G. Gaston."  (Doc. 47-4 at 85, 95).

After the hearing, the Board voted to approve Mr. Morgan's transfer.  (Doc. 36-5 at 5 ¶ 5; Doc. 36-6 at 10).  Mr. Morgan administratively appealed the Board's decision, and a hearing officer affirmed the demotion to the position of project manager with the Facilities and Maintenance Department.  (Doc. 36-5 at 5; Doc. 36-6 at 11–12).  Mr. Morgan did not appeal the hearing officer's decision.  (Doc. 36-5 at 5).

After the Board eliminated the CIP Department, it contracted with a company called BLOC Global to consult on capital projects.  (Doc. 36-5 at 4 n.4).  From January to November 2016, the Board paid BLOC Global "just over $53,000" out

---

[1] Mr. Love retired soon after his transfer, and the Board offered the newly vacant project manager position to Ms. Gardner, who accepted.  (Doc. 47-3 at 74–75, 82).

5

of funds allocated to the capital improvement plan, which could not have been used to pay employee salaries or benefits. (*Id.*).

Mr. Morgan resigned in July 2017. (Doc. 36-1 at 12). In April 2019, when Mr. Morgan was deposed, he testified that after he stopped working for the Board, it hired another company "that does facility management and facility assessments . . . to perform facility assessment and help with the capital expenditures on an annual basis for $400,000 a year for a three-year term with the option of an additional year." (Doc. 36-1 at 23–24).

2. The Failure to Interview and Hire Mr. Morgan

On May 16, 2016, while Mr. Morgan was challenging the proposed demotion to project manager, he applied to become the Director of Facilities, Operations and Maintenance. (Doc. 36-1 at 32). The Board did not interview or hire him for the position. (Doc. 36-1 at 32). Mr. Morgan asserts that, like his demotion, the failure to interview and hire him was discriminatory and retaliatory. The Board responds that it did not interview him because Mr. Morgan withdrew his application from consideration before the Board reviewed the applications. (*See* Doc. 38 at 6–9).

The Board uses a program called SearchSoft to accept job applications. (Doc. 36-4 at 4–5). Once an applicant has submitted an application, SearchSoft generates and sends to the applicant an email confirming that "the district" has received the application. (*Id.* at 6, 11). SearchSoft can conceal an application from the Board if

6

the applicant elects to remove his application from the sight of a district. (Doc. 36-4 at 9). Despite making that election, the application remains in the system, so that when the district closes the position, SearchSoft generates an email, electronically signed by a Board human resources employee, informing the applicant that the position has been filled but that the application "will remain on file for one year." (*Id.* at 9–10, 31).

On May 3, 2016, the Board posted a notice of vacancy for the Director of Facilities, Operations and Maintenance. (Doc. 36-5 at 5 ¶ 6). On May 16, 2016, Mr. Morgan applied to the position, receiving the email confirming receipt of his application. (Doc. 36-1 at 32; Doc. 36-4 at 29). On May 26 and June 7, 2016, the Board interviewed four of the applicants; Mr. Morgan was not one of the four applicants interviewed. (Doc. 36-5 at 5 ¶ 6). After the interviews, the interim superintendent recommended hiring Victor Pettus. Mr. Pettus had worked in the Facilities and Maintenance Department since 1995; served as a supervisor in that department from 2003 until 2016; and served as the Interim Director of Facilities, Maintenance and Operations from July 2014 until November 2014. (*Id.* at 5–6 ¶ 6; Doc. 36-1 at 32). On July 18, 2016, the Board appointed him as the Interim Director, making him the permanent Director on November 22, 2016. (Doc. 36-5 at 5 ¶ 6). In January 2017, Mr. Morgan received SearchSoft's rejection email informing him that the position had been filled. (Doc. 36-4 at 31). He testified that when he asked

the superintendent's chief of staff why the Board did not interview him, the chief of staff said that "there's some philosophical differences going on with it right now and the Board is involved with it." (Doc. 36-1 at 32).

After Mr. Morgan complained to the Equal Employment Opportunity Commission ("EEOC") of discrimination relating to the failure to hire him, a Board human resources employee reviewed the list of applicants that SearchSoft had provided to it. (Doc. 36-5 at 7 ¶ 8). Mr. Morgan's name does not appear on that list. (Doc. 36-7 at 2–7; *see also* Doc. 36-8 at 2). As a result, she asked SearchSoft to audit his account. (Doc. 36-5 at 7 ¶ 8). SearchSoft's audit stated that after Mr. Morgan applied for the position on May 16, he "removed Birmingham from where you want to work on 5-23-16." (Doc. 36-7 at 9). Mr. Morgan denies removing his application from the Board's consideration. (Doc. 36-1 at 32).

3. The Composition of the Board

At the time of the events involved in this lawsuit, the Birmingham Board of Education had one Caucasian and eight African-American members. (Doc. 36-2 at 8). When asked what made Mr. Morgan think that the Board's actions were racially motivated, Mr. Morgan responded that several of the Board members had routinely mocked him at Board meetings, accusing him of financial malfeasance and incompetence. (Doc. 36-1 at 26–30).

8

## II. DISCUSSION

In Counts One and Two, Mr. Morgan asserts that his demotion and the Board's failure to interview and hire him for the Director position constitutes race and color discrimination under Title VII and 42 U.S.C. § 1981, through 42 U.S.C. § 1983. (Doc. 1 at 7–11). In Counts Three and Four, Mr. Morgan asserts that the Board's failure to interview and hire him was retaliation, in violation of Title VII and § 1981, for his challenge to the demotion as discriminatory. (*Id.* at 12–15).

The Board moves for summary judgment, contending that (1) Mr. Morgan's discrimination and retaliation claims fail because he has not established that the Board itself harbored any unlawful animus, either racial or retaliatory; and (2) his retaliation claims fail because he has not established that he engaged in protected activity or that the Board took any action against him based on his engaging in protected activity.[2] (Doc. 38 at 11–31).

In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party,

---

[2] The Board also argued that Mr. Morgan's Title VII claims are procedurally barred because he failed to administratively exhaust them. (Doc. 38 at 14–16, 20–21, 26–27). However, Mr. Morgan's Title VII and § 1981 claims are identical (*see* Doc. 1 at 7–15), and aside from Title VII's administrative exhaustion requirements, Title VII and § 1981 claims "have the same requirements of proof and use the same analytical framework," *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Even if Mr. Morgan did fail to administratively exhaust his Title VII claims, the court must address the merits of his identical § 1981 claims. Because the administrative exhaustion requirements of Title VII are not jurisdictional, *see Jackson v. Seaboard Coast Line R. Co.*, 678 F.2d 992, 1009–10 & n.7 (11th Cir. 1982), the court finds that the interest of judicial economy compels addressing the merits of the Title VII and § 1981 claims together, and the court will not address the Board's administrative exhaustion arguments.

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Hamilton*, 680 F.3d at 1318.

Generally, where a plaintiff bases a Title VII or § 1981 claim of race discrimination or retaliation on circumstantial evidence, the court applies the *McDonnell Douglas* framework. *See, e.g.*, *McCann v. Tillman*, 526 F.3d 13780, 1373 (11th Cir. 2008). In this case, however, Mr. Morgan concedes that he cannot make the initial showing required under the *McDonnell Douglas* test because he has not identified similarly situated comparators. (Doc. 46 at 35). Instead, he relies on the test set out in *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011), in which the Eleventh Circuit held that a plaintiff may survive summary judgment if he "presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* at 1328 (quotation marks and alteration omitted).

1. Race Discrimination Claims

Mr. Morgan identifies three separate purportedly discriminatory decisions: (1) the Board's decision to demote him; (2) the Board's failure to interview him for the Director of Facilities, Operations and Maintenance; and (3) the Board's decision to hire Victor Pettus, who Mr. Morgan asserts is less qualified than him. (Doc. 46

at 22). The Board contends that Mr. Morgan has not presented any evidence that race motivated any of those decisions.[3] (Doc. 38 at 11–14).

Mr. Morgan responds that a reasonable jury could find that the Board was motivated by his race to demote him because (1) a majority of the Board was African-American; (2) within a day of Mr. Morgan complaining about A.G. Gaston, his supervisor him issued a letter of reprimand; and (3) within a month of Mr. Morgan's complaints about A.G. Gaston, the Board eliminated the CIP Department. (Doc. 46 at 24, 37–38). He relies on the close temporal proximity of these events to argue that a reasonable jury could infer that the real reason for the Board's actions was discriminatory animus, not financial concern. (*Id.* at 38).

The evidence on which Mr. Morgan relies does not create a convincing mosaic of circumstantial evidence of discrimination. First, the fact that a majority of the Board was African-American at the time of his demotion and his application for the Director position is not circumstantial evidence of racial animus. Likewise, the fact that Mr. Morgan's supervisor—who was not a member of the Board—reprimanded him soon after he complained about an African-American-owned

---

[3] Under Title VII, "[a]n employee must establish an adverse employment action by proving that a decision of the employer impacted the terms, conditions, or privileges of her job in a real and demonstrable way." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 920–21 (11th Cir. 2018) (quotation marks and alterations omitted). Because Defendants have not argued that a failure to interview someone, standing alone, is not an adverse employment action, the court will assume that the failure to interview constitutes an adverse employment action independent from the failure to hire him.

11

general contractor and its subcontractors is not circumstantial evidence that the Board discriminated against him.

Finally, Mr. Morgan has not presented any evidence from which a reasonable juror could infer that the Board eliminated the CIP Department in order to demote him. The superintendent testified that she and her cabinet recommended eliminating the Department to save money. (Doc. 36-2 at 7, 11). Moreover, by eliminating the CIP Department, the Board ended up terminating the jobs of two of Mr. Morgan's three African-American coworkers. (Doc. 36-3 at 37; Doc. 36-5 at 3–4 ¶ 4; Doc. 36-6 at 4–5).

Mr. Morgan contends that the Board's proffered financial reason for eliminating the CIP Department is untrue because the CIP Department had cost $384,163.05 per year in salaries and benefits, but in recent years the Board has hired a company that charges almost $400,000 per year to do the same work. (Doc. 46 at 21). The court notes that the Board presented testimony that during 2016, the year in which it eliminated the CIP Department and demoted Mr. Morgan, it spent only $53,000 in consulting services, which is considerably less than the CIP Department's $484,163.05 budget for salaries and benefits.[4] (Doc. 36-5 at 4 n.4). And although Mr. Morgan testified that, at some point after his resignation in 2017—at least a year

---

[4] The court also notes that Mr. Morgan's argument that "the Board now spends more than ten times the budget of Morgan's shuttered department to perform the same activities that department performed" (doc. 46 at 38) is disingenuous at best. Mr. Morgan bases that statement on his testimony that, after his resignation in 2017, the Board spent "approximately four million

12

after the elimination of the CIP Department—the Board hired a new consulting company earning about $400,000 per year, that testimony does not give rise to a reasonable inference that the Board's true purpose in eliminating the CIP Department was to demote him based on his race.

Mr. Morgan has presented nothing more than his feeling that the Board discriminated against him based on race. But "[a]n inference[ ] is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact." *Smith*, 644 F.3d at 1328 n.25 (quotation marks and second alteration omitted). Mr. Morgan has not presented any facts from which a factfinder could make a reasonable inference that his demotion was discriminatory.

Next, Mr. Morgan contends that a reasonable jury could find that the Board declined to interview and hire him as the Director of Facilities, Operations and Maintenance based on his race because (1) Mr. Morgan's testimony that he did not withdraw his own application refutes the Board's defense that it was not aware of his interest in the position; and (2) the Board hired a less qualified African-American candidate instead of him. (Doc. 46 at 38–41).

---

dollars directly associated with capital." (Doc. 36-1 at 23). But what the Board has spent on capital projects is entirely distinguishable from what it spent on employee salaries and benefits. The only evidence presented to this court about the CIP Department's budget related to the annual budget for salaries and benefits, not the funds that the Department was authorized to spend on capital projects. A reasonable factfinder could not find evidence of race discrimination based on a discrepancy between what the Board used to spend on salaries and benefits and what the Board now spends on capital projects.

13

Again, Mr. Morgan has not satisfied his burden of presenting circumstantial evidence from which a reasonable juror could find that the Board engaged in discrimination. Even accepting Mr. Morgan's testimony that he did not withdraw his application from the Board and his speculation that someone "tampered" with his application (doc. 46 at 40), he has not presented evidence indicating that the Board's reason for declining to interview him was related to his race as opposed to some other, permissible reason. This court is "not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).

Mr. Morgan argues that a reasonable factfinder could find discriminatory animus because the Board's choice, Mr. Pettus, was not as qualified as Mr. Morgan (*see* doc. 36-1 at 32), but the Board has presented evidence that Mr. Pettus was qualified for the position (*see* Doc. 36-5 at 6).[5] As the Eleventh Circuit has stated, "Title VII does not require an employer to hire or promote the most qualified applicant; it only requires that the employer make such decisions without regard to

---

[5] The court notes that, under the *McDonnell Douglas* test, the plaintiff's initial burden is to establish a *prima facie* case of discrimination, one requirement of which is that the defendant hired "other equally or less qualified employees who were not members of the protected [class]." *Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir. 1988). But Mr. Morgan has conceded that he cannot establish a *prima facie* case of race discrimination (*see* doc. 46 at 35), so whether he can make out another element of the *prima facie* case is irrelevant.

race, sex, religion, color, or national origin." *McCarthney v. Griffin-Spalding Cty. Bd. of Educ.*, 791 F.2d 1549, 1552 (11th Cir. 1986). To survive summary judgment where the employer has presented evidence that it hired another qualified candidate for a position, the plaintiff's burden is to "show that the disparities between the successful applicant's and her own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation marks omitted). Mr. Morgan has not done so. Accordingly, the court **WILL GRANT** summary judgment in favor of the Board and against Mr. Morgan on his claims of race and color discrimination raised in Counts One and Two.

2. Retaliation Claims

In Counts Three and Four, Mr. Morgan asserts that the Board's failure to interview and hire him as the Director of Facilities, Operations and Maintenance was retaliation for his challenge to his demotion. (Doc. 1 at 12 ¶ 51, 14–15 ¶ 60). The Board seeks summary judgment on the basis that Mr. Morgan did not engage in any protected activity because challenging an employment decision, without complaining about an unlawful employment practice, is not protected, nor is complaining about a contractor or subcontractor's performance. (Doc. 38 at 28–29). In the alternative, it argues that he cannot establish causation because it selected the

15

candidates to interview before the November 2016 hearing at which Mr. Morgan claimed that the superintendent's recommendation to demote him was related to his race. (Doc. 51 at 10).

Title VII prohibits discrimination against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Similarly, § 1981 covers claims of retaliation in the employment context. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008). The court analyzes Title VII and § 1981 retaliation claims under the same framework. *See Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

To survive a motion for summary judgment on a claim of retaliation under Title VII or § 1981, a plaintiff must present evidence that "he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1212–13 (11th Cir. 2008). "Protected activity" includes both formal and informal complaints of discrimination made to the plaintiff's supervisors or employers. *See Rollins v. Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989).

As an initial matter, the court notes that Mr. Morgan's response to the motion for summary judgment asserts for the first time that "[t]he retaliation experienced by Morgan [after he complained at the hearing] was the Board's vote to approve his

16

demotion." (Doc. 46 at 42). But Mr. Morgan's complaint expressly asserted that the allegedly retaliatory action was the Board's failure to interview and hire him as the Director of Facilities, Operations and Maintenance. (Doc. 1 at 12 ¶ 51, 14–15 ¶ 60). "It is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012). Mr. Morgan's complaint did not put either the Board or the court on notice that he was raising a claim of retaliatory demotion; the complaint asserted only retaliatory failure-to-promote. Accordingly, the court will not address Mr. Morgan's argument that the Board's vote to approve his demotion was retaliatory.

The court agrees with the Board that no reasonable juror could find that Mr. Morgan's complaint of race discrimination caused the Board's decision not to interview and hire him. The uncontested evidence is that the Board selected interviewees for the Director position in May 2016, interviewed them in May and June 2016, selected Mr. Pettus as the interim Director in July 2016, and made his appointment final on November 22, 2016. (Doc. 36-5 at 5 ¶ 6). But Mr. Morgan did not raise race as an issue before the Board until his hearing on November 9, 2016. (*See* Doc. 47-4 at 85, 95). Accordingly, the Board's decision not to interview Mr. Morgan, and its decision to select Mr. Pettus, could not have been related to his complaint of race discrimination.

The court **WILL GRANT** summary judgment in favor of the Board and against Mr. Morgan on his claims of retaliation raised in Counts Three and Four.

## III. CONCLUSION

The court **WILL GRANT** the Board's motion for summary judgment and **WILL ENTER SUMMARY JUDGMENT** in favor of the Board and against Mr. Morgan on all of his claims. The court will enter a separate order and final judgment consistent with this opinion.

**DONE** and **ORDERED** this October 1, 2019.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE